UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-CR-356 (RHK)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MALAH AUSTIN MEHN,

    Defendant.

**GOVERNMENT'S POSITION ON SENTENCING**

## I. INTRODUCTION

The United States of America, by and through its attorneys, Gregory G. Brooker, Acting United States Attorney for the District of Minnesota, and Amber M. Brennan, Assistant United States Attorney, hereby files this Position on Sentencing with regard to the sentencing of Defendant Malah Austin Mehn.

The United States has no objections to the Presentence Investigation Report ("PSR"), and incorporates the facts and guideline calculations therein.

Based on the facts of this case, the PSR, and the factors set forth at 18 United States Code Section 3553(a), unless there are other grounds for departure, the government respectfully recommends a sentence of 37 months' imprisonment, the bottom of Mehn's advisory guidelines range as determined by the PSR, as well as mandatory restitution to be determined by the Court at the time of sentencing.[1]

---

[1] The government intends to work with the defendant and his counsel to prepare a proposed stipulation for restitution that it will file with the Court prior to sentencing.

## II.   RELEVANT FACTS AND PSR FINDINGS

*a. The Offense Conduct*

The circumstances of the offense are set forth in detail in the Presentence Investigation Report ("PSR") and the parties' Plea Agreement and Sentencing Stipulations ("PA"). (PSR ¶¶ 18-44; PA ¶ 3). An overview of the facts most relevant to sentencing follows.

Mehn, along with 10 defendants charged in related cases and several other individuals who have not been charged, participated in a counterfeit check scheme that was conducted at banks and check cashing businesses throughout the Twin Cities metropolitan area and elsewhere between 2009 and 2012. There were three essential roles performed by the participants in this scheme: first, that of a manufacturer, who provided the checks used to conduct the fraudulent transactions; second, that of a manager/recruiter, whose function was to facilitate the transactions by connecting manufacturers with check passers or "runners" and to assist the transactions by supporting the runners in a multitude of ways, including providing the runners with the checks, driving runners to conduct the transactions, and instructing runners on how to conduct the transactions; and finally, the role of the "runner," who, as already indicated, carried out the fraudulent transactions by presenting counterfeit checks at check cashing businesses or financial institutions, thereby supplying their names and faces to the conspiracy in exchange for a cut of the proceeds.

In order for a transaction to be successful, a counterfeit check had to utilize a real bank account number along with a real routing number and business name. Conspirators obtained information about legitimate business bank accounts and customers from a variety

of sources, including from paychecks that employers had issued to them, their friends, or family members, or from other types of business checks that they or their associates had received. Manufacturers then used the legitimate account information to create counterfeit checks purporting to draw from those accounts. They entered names of real businesses, along with the bank account numbers and routing numbers of the banks where those accounts were held, into their check writing software as the "payor" accounts from which the counterfeit checks drew. Manufacturers then printed the checks onto blank check stock so that they would look and feel like real business checks.

The counterfeit checks were usually made payable to runners who had agreed to present the checks at banks and businesses in order to obtain cash proceeds. In some instances, the runners were able to successfully negotiate the checks for cash instantly. In other instances, they were required to deposit the checks and then wait for a period of time before withdrawing the funds. In either case, conspirators were frequently able to withdraw some or all of the amount of the deposited checks before the fraud was discovered.

Conspirators also obtained legitimate personal checks for use as part of the scheme. They obtained real personal checks from friends, family members, or acquaintances; they also used personal checks that were stolen and personal checks from closed bank accounts. Conspirators then used these once-legitimate personal checks to commit fraud in the same way as they used the counterfeit checks – by making the checks payable to runners in amounts that were not available in the accounts, and then negotiating the checks to try to obtain proceeds before the fraud was discovered.

Mehn participated in this conspiracy during an approximately seven-month period between March and September 2012. Like many others, he participated first as a runner by negotiating counterfeit and otherwise fraudulent checks that were made payable to him and attempting to obtain cash proceeds from those checks. However, within a very short period of time Mehn became a prolific recruiter. Among other activities, Mehn: solicited other runners who would agree to negotiate checks in their own names; obtained counterfeit checks from manufacturers that he provided to those runners; transported the runners to banks and businesses so that they could negotiate the checks; and he shared in the proceeds that were gained as a result of any successful transactions. Over a several month period, Mehn transported several runners per day to banks and check cashing businesses so that they could negotiate counterfeit checks that he obtained and provided to them.

In one instance, Mehn and another coconspirator used the identity of one runner, D.M., and opened a bank account in D.M.'s name, which they then used to negotiate counterfeit checks without D.M.'s knowledge.

    b. *Characteristics of Mehn*

Mehn is 33 years old, and aside from the instant offense, he has just one felony conviction, for third degree possession of cocaine, that he incurred in the State of New Jersey in 2007. He has an extensive record of misdemeanors including multiple convictions for providing a false name to a police officer, theft, driving while intoxicated, and driving after cancellation. Until now, the longest sentence Mehn has served is 90 days in jail. (PSR ¶¶ 89-129.)

Mehn has been employed on a full time basis for most of his adult life. (PSR ¶¶ 184-188.) Between 2012 and 2014, he was not employed because he was attending the Minnesota School of Business. Mehn completed a little more than half of the credits he attempted during that time (12 out of 21) and earned a GPA of 1.91 for those credits. (PSR ¶¶ 180.)

When law enforcement approached Mehn in September 2012, he immediately confessed what he had done.

### III.   ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors"). Accordingly, the Government requests that the Court first take the advisory guidelines into account as the starting point of its analysis, and then consider the factors set forth in 18 U.S.C. § 3553(a), and then any grounds for departure before determining its final sentence.

As set forth above, the Government agrees with the PSR, which concluded that Mehn's advisory Guidelines range is 37-46 months' imprisonment. Beyond the applicable guidelines range, the Court must consider: "the nature and circumstances of the offense,"

5

"the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," and "the need to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). Based on all of the factors, the United States believes a sentence of 37 months' imprisonment – the bottom of Mehn's advisory guidelines range – is appropriate unless there are further grounds for departure.

## IV.   CONCLUSION

Given the offense conduct at issue and all of the other factors relevant to sentencing, the Government respectfully believes that unless there are any further grounds for departure, a sentence of 37 months' imprisonment, along with mandatory restitution to be determined by the Court at the time of sentencing, achieves a reasonable punishment for Garrett's offense and serves the goals embodied by 18 U.S.C. § 3553(a), but is not greater than necessary to do so.

Dated:  August 30, 2017

                                          Respectfully Submitted,

                                          GREGORY G. BROOKER
                                          Acting United States Attorney

                                          *s/Amber M. Brennan*
                                          BY:  AMBER M. BRENNAN
                                          Assistant U.S. Attorney
                                          Attorney ID No. 0285961